HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE STILLAGUAMISH TRIBE OF
INDIANS,

              Plaintiff,

    v.

PILCHUCK GROUP II , L.L.C.,

              Defendant.

CASE NO. C10-995RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment from Plaintiff, The Stillaguamish Tribe of Indians (the "Tribe") and a barely distinguishable motion from Defendant Pilchuck Group II, L.L.C. ("Pilchuck").[1] Dkt. ## 18, 21. Pilchuck also filed a motion to seal documents. Dkt. # 19. No party requested oral argument on any motion. For the reasons stated below, the court GRANTS the Tribe's motion because, as a matter of law, the Tribe did not waive its sovereign immunity from

---

[1] The court cannot imagine why the parties chose to duplicate their arguments repeatedly in two separate but essentially identical motions. That duplication extended to the evidentiary record, where the parties filed numerous copies of several documents. Had the parties agreed to file cross-motions, they would have reduced the number of briefs on these motions from six to four or even three. No one benefitted from the flood of paper before the court, least of all the parties.

1   suits arising out of the contract at the core of this case.  The court accordingly enjoins
2   Pilchuck from pursuing its arbitration demand against the Tribe.  The court DENIES
3   Pilchuck's motion for the same reasons.  The court DENIES the motion to seal, and
4   directs the clerk to UNSEAL the documents at Docket No. 20.[2]

5       This order will also address a motion pending in *Stillaguamish Tribal Enterprise*
6   *Corp. v. Pilchuck Group II, L.L.C.*, Case No. C11-387RAJ.  Stillaguamish Tribal
7   Enterprise Corporation ("STECO") is a Tribe-chartered entity.  In early 2011, Pilchuck
8   supplemented its arbitration demand against the Tribe with a virtually identical demand
9   against STECO regarding the same dispute.  Like the Tribe, STECO sued to enjoin the
10  arbitration, invoking its sovereign immunity.  STECO moved for summary judgment.
11  Dkt. # 6.  Again, no one requested oral argument.  The court DENIES STECO's motion
12  solely because it finds that Pilchuck has not had an opportunity to pursue discovery in
13  that case.  It imposes conditions on Pilchuck before it can pursue that discovery.  The
14  court will enter an order in Case No. C11-387 memorializing its decision.

15                          **II. BACKGROUND**

16      The Tribe, like all Indian tribes, is a "'distinct, independent political
17  communit[y] . . . retaining [its] original natural rights' in matters of local self-
18  government."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting
19  *Worcester v. Georgia*, 6 Pet. 515, 559 (1832)).  Although the Tribe lacks complete
20  sovereignty, it nonetheless enjoys sovereign immunity, subject only to express abrogation
21  of that immunity by the Tribe or Congress.  *Santa Clara Pueblo*, 436 U.S. at 58.  No
22  congressional abrogation of immunity is applicable in this case.

23

24  _____

25      [2] Pilchuck filed its motion to seal merely to satisfy its obligation to protect documents the
26  Tribe had designated as confidential.  The Tribe did not respond to the motion, much less explain
    how sealing the documents complies with the standards set forth in Local Rules W.D. Wash.
27  CR 5(g).

Pilchuck has demanded arbitration against the Tribe in a dispute over a contract to develop an RV park. That contract, a July 15, 2006 "Working Agreement," is on its face an agreement between Pilchuck and the Tribe. David Nelson, one of Pilchuck's principals, signed the contract on Pilchuck's behalf. The Tribe asserts, however, that the person who purported to sign the Working Agreement on its behalf, Edward Goodridge, Senior ("Mr. Goodridge Sr."), had no authority to do so. STECO is nowhere mentioned in the Working Agreement. Nonetheless, as the court will later discuss, Pilchuck contends that Mr. Goodridge Sr. not only bound the Tribe to the Working Agreement, but STECO as well.

The Working Agreement contains an arbitration clause and a waiver of the Tribe's sovereign immunity. Agr. ¶¶ 10.1-10.4, 11.1. No one disputes that the Agreement, had the Tribe actually authorized it, would be effective to bind the Tribe to arbitration over any disputes arising under the contract. The sole dispute is whether the Tribe authorized the Agreement, and more particularly, whether it authorized the arbitration clause and sovereign immunity waiver.

Mr. Goodridge Sr. was once the Chairman of the Tribe's Board of Directors ("Tribal Board"), the six-member body who the Tribe's constitution empowers to govern the Tribe. It is not clear precisely when Mr. Goodridge Sr. left the Tribal Board, but it is undisputed that by 2006, not only was he not a member of the Board, but Mr. Nelson knew as much. Nelson Decl. ¶ 6. Mr. Goodridge Sr. was, however, the Chief Executive Officer of STECO and the Chair of STECO's board, positions he held from STECO's incorporation in 2002 until 2008.

Prior to the Working Agreement, the Tribe was no stranger to Pilchuck or its principals, Nathan Chapman and Mr. Nelson. They began consulting for the Tribe in 2002. Their role was to seek economic opportunities for the Tribe. There is no dispute that they did so, and that they worked on several projects with and for the Tribe, including the Tribe's casino. There is also no dispute that the Tribe member with whom

they worked most closely was Mr. Goodridge Sr.  That relationship began while Mr.
Goodridge Sr. was the Chairman of the Tribal Board, and continued after he left the
Board and became STECO's CEO.

Mr. Nelson had the Working Agreement drafted in July 2006 to memorialize plans
to develop specific parcels of property along Interstate 5 into an RV park.  The form of
the Working Agreement, including its immunity waiver, closely resembles the form of
several other contracts between entities in which Mr. Nelson was involved and the Tribe.
Although the parties focus on the RV park, the Working Agreement acknowledges a
variety of other business possibilities for the subject land.  Agr. ¶ 1.3.  The Working
Agreement described a process wherein Pilchuck would purchase the subject property
and take all steps necessary to transfer it to the United States as trust land for the Tribe.
Once the property became trust land, the Tribe was to lease the property back to Pilchuck
for the operation of the RV park or other businesses.  Mr. Nelson declares that he
distributed copies of the Working Agreement to members of the Tribal Board and
STECO.  At least two members of the Board claim that they never saw the Working
Agreement until Pilchuck initiated arbitration in 2010.

Pilchuck contends that the Tribe gave its approval for the Working Agreement at
an October 16, 2006 Tribal Board meeting.  Mr. Nelson attended that meeting along with
Mr. Goodridge Sr.  Only four of the six Board members were present at the meeting,
including the Board's Chair, Shawn Yanity, and its Vice-Chair, Mr. Goodridge Sr.'s son,
Edward Goodridge, Jr. ("Mr. Goodridge Jr.").

Although the participants in the October 2006 meeting discussed the RV park
project, they never mentioned the Working Agreement.  Mr. Nelson described the RV
project at length, but for reasons he never explains, he did not refer to the Working

Agreement.  He testified that he did not attend the meeting to get approval for the

Working Agreement.

> Q:     But at this meeting you were trying to get a blessing for the Pilchuck [Working Agreement]; isn't that correct?
>
> A:     I'm not saying that at this meeting that's what I was trying to get, no.

Smith Decl. (Dkt. # 34-1), Ex. E (Nelson Depo. at 146).  Indeed, Mr. Nelson testified that

he "d[id]n't think that agreement was even on the table" at the October meeting.  *Id.*

(Nelson Depo. at 144).  He did not bring a copy of the Working Agreement to the

meeting, and he "wasn't talking about that working agreement" at the meeting.  Despite

his failure to mention the Working Agreement, the transcript of the meeting reveals that

he offered an extended description of the RV park project.  Smith Decl. (Dkt. # 18-2), Ex.

A (transcript of Oct. 16, 2006 meeting, hereinafter "Tr.").  He explained that he had

assembled an investor group to purchase the subject property for $1.735 million,

conditioned on a guarantee that the Tribe would repurchase the property if the project did

not come to fruition.  Tr. at 2-3, at 4 ("You guys need to at lease [sic] say yes, Dave, we

support your RV park and we want to do it and if we can't do it then we'll buy the

property from you later for another use.").  After an extended discussion of the project

and the buyback guarantee, Mr. Nelson asked, "So, is it safe to say then that if I go ahead

and put my earnest money up for this that I won't lose my money?"  Tr. at 12.  The sole

response to the question came from Mr. Goodridge Jr., who said: "I would say that's

safe."  *Id.*  No other Board member offered a response.  Mr. Nelson responded: "Well I

trust the tribe."  *Id.*  At no point during the meeting did the parties discuss arbitration or

sovereign immunity.  Moreover, Mr. Nelson's description of the RV project at the

meeting differed from the terms of the Agreement.  For example, the Working

Agreement obligated the Tribe to pay a 30 percent surcharge to Pilchuck in the event it

bought the property.  Agr. ¶ 2.6.  Mr. Nelson proposed a surcharge of 10 to 12 percent.

Tr. at 3 ("[I]f we can't do the park, the tribe would have to pay them back some money

with say a 10 or 12 percent return and then you own the property.").[3]  At no point in the meeting did anyone discuss drafting a contract memorializing the RV park agreement.  At no point in the meeting did anyone discuss who would negotiate such an agreement on behalf of the Tribe.  At no point in the meeting did anyone suggest that Mr. Goodridge Sr. would act as the Tribe's agent in further negotiations.

Nonetheless, according to Mr. Goodridge Sr., he signed the Working Agreement on behalf of the Tribe and STECO sometime after the October meeting.  Goodridge Sr. Decl. ¶ 17.  No one knows when Mr. Nelson signed the Agreement, not even Mr. Nelson.  Smith Decl. (Dkt. # 34-1), Ex. E (Nelson Depo. at 147-49).  The only date on the Agreement is July 15, 2006.  Neither Mr. Goodridge Sr.'s signature nor Mr. Nelson's is dated.

There is no dispute that the Tribe took actions after the October 16 to help bring the RV park project to fruition.  Mr. Yanity himself gave approval to at least one preliminary study.  There is no dispute that Mr. Goodridge Jr. and Mr. Goodridge Sr. worked with Pilchuck toward completing the project.  According to Mr. Nelson, the Tribe decided not to continue with the RV park project in fall 2007.  Nelson Decl. ¶ 18.  No one disputes Mr. Nelson's statement that the Tribe entered "option agreements" to repurchase the subject property and made periodic payments, even though the "option agreements" are not part of the record.  *Id.*

By 2008, however, the composition of the Board had changed.  Mr. Goodridge Jr. was no longer a member of the Board, and Mr. Goodridge Sr. left his position at STECO.

---

[3] In another example, Mr. Nelson told the Board that he wanted the Tribe to lease the park property back to his group after it became trust land, suggesting a 50-year lease.  Tr. at 5.  The Working Agreement, however, expressly required the Tribe to execute a lease in a specific format after the subject property became trust property.  Agr. ¶ 2.3 (requiring Tribe to "produce an executed Lease for the property that shall be in substantially the same form as Exhibit B").  Pilchuck does not explain why would Mr. Nelson discuss this issue without referring to the Agreement.

1   The new Board declined to honor any repurchase commitment, leaving Pilchuck in

2   possession of the subject property.  Pilchuck made an arbitration demand on the Tribe in

3   January 2010, and took steps to begin the arbitration.  The Tribe refused to participate in

4   the arbitration.  With Pilchuck's consent, the court preliminarily enjoined the arbitration

5   in July 2010.

6        With this background in mind, the court turns to the question of whether the Tribe

7   waived its sovereign immunity and is therefore subject to Pilchuck's arbitration demand.

8   The court also addresses whether STECO is immune from an arbitration demand

9   regarding the same dispute.

10                              **III. ANALYSIS**

11        When considering motions for summary judgment, the court must draw all

12   inferences from the admissible evidence in the light most favorable to the non-moving

13   party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary

14   judgment is appropriate where there is no genuine issue of material fact and the moving

15   party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving

16   party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v.*

17   *Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue

18   of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

19   (1986).  The opposing party must present probative evidence to support its claim or

20   defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.

21   1991).  The court defers to neither party in resolving purely legal questions.  *See*

22   *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

23        Although this case presents several factual disputes that the court cannot resolve

24   on summary judgment, no disputed facts prevent the court from concluding as a matter of

25   law that the Tribe did not waive its sovereign immunity from Pilchuck's arbitration

26   demand.  The court cannot, however, foreclose the possibility that STECO authorized

27   Mr. Goodridge Sr. to bind it to the Working Agreement and its immunity waiver.

1  **A.      The Tribe Did Not Waive Its Sovereign Immunity.**

2          As the court has noted, tribes are subject to suit "only where Congress has

3  authorized the suit or the tribe has waived its immunity." *Kiowa Tribe v. Mfg. Techs.,*

4  *Inc.*, 523 U.S. 751, 754 (1998).  A tribe's waiver of immunity must have the "requisite

5  clarity." *C&L Enters., Inc. v. Potawatomi Indian Tribe*, 532 U.S. 411, 418 (2001).

6  Various cases have refined what level of clarity is necessary for an enforceable waiver.

7  In *C&L*, for example, the court held that an arbitration clause in a contract that did not

8  use the words "sovereign immunity" was nonetheless a sufficiently clear waiver. *Id.* at

9  415 (quoting arbitration clause), at 420-21 (finding waiver).  A waiver of immunity must

10  be express, not implied.  For example, in *Allen v. Gold Country Casino*, 464 F.3d 1044,

11  1047 (9th Cir. 2006), the court held that a Tribe had not waived immunity in a suit by one

12  of its employees even though it had agreed to follow state and federal employment law.

13          Here, the only waiver of immunity to which anyone points is the express waiver

14  contained in the Working Agreement.  Again, no one disputes that this waiver has the

15  requisite clarity, the dispute is over whether the Tribe actually agreed to the waiver.  The

16  Tribe insists that its failure to expressly authorize Mr. Goodridge Sr. to sign the Working

17  Agreement is the end of the debate.  Pilchuck, on the other hand, asks the court to apply

18  principles of agency law to reach the conclusion that Mr. Goodridge Sr. had actual or

19  apparent authority to sign the Working Agreement on behalf of the Tribe.  Neither party's

20  position is persuasive.

21          The Tribe's position ignores that its "policies" for authorizing agents to enter

22  contracts or waive sovereign immunity are nebulous at best.  The Tribe's constitution is

23  silent regarding who may waive the Tribe's immunity or the procedures for doing so.

24  Until 2010, no Board resolution or other formal document set forth policies and

25

26

27

procedure for waiving immunity.[4]  At the time Mr. Goodridge Sr. signed the working Agreement, the Tribe had no consistent practice for authorizing people to enter contracts or waive sovereign immunity on its behalf.  Mr. Yanity and other Board members contend that the Board's practice was to authorize contracts and sovereign immunity waivers only in written resolutions of the Board.  This contention is flatly incorrect.  The record reflects that many people have signed contracts purportedly on behalf of the Tribe without any Tribal Board resolution authorizing the act.  Manheim Decl. (Dkt. # 25), ¶¶ 9-21 (summarizing contracts entered without Board resolution).  None of these agreements contain an express sovereign immunity waiver.  The record reflects that while the Tribe entered many contracts pursuant to a written resolution of the Tribal Board, it also entered many contracts without a resolution or any other express approval from the Tribal Board.  The record also reflects that agents purporting to act on behalf of the Tribe (most often members of the Board) frequently entered contracts on behalf of the Tribe without the written approval of the Board.

Pilchuck's reliance on agency principles ignores thorny choice of law questions. If agency law principles apply when a purported agent of a tribe acts on the tribe's behalf, whose agency law principles apply?  Pilchuck urges the application of Washington law, but does not explain why Washington law should apply to a question of tribal authority. Pilchuck also does not explain how its approach avoids the Supreme Court's admonition that "tribal immunity is a matter of federal law and is not subject to diminution by the States."  *Kiowa Tribe*, 523 U.S. at 756.  Tribal law could supply the relevant agency principles, but the record indicates that the only sources of law for the Stillaguamish

---

[4] Mr. Yanity contends that an October 26, 2010 resolution of the Tribal Board "reaffirmed the Tribe's longstanding policy that all waivers of the Tribe's sovereign immunity are only granted by the Board in writing."  Yanity Decl. (Dkt. # 18-1) ¶ 9.  A resolution adopted years after Mr. Goodridge Sr. signed the Working Agreement (and months after this litigation began) is of no value in illuminating the Tribe's practices in 2006.

1   Tribe are the Tribe's constitution and the resolutions of the Tribal Board.  No Board

2   resolution establishes generally applicable tribal agency principles.  The Tribe's

3   constitution is also silent on this subject.  The constitution invests the Board with plenary

4   power to take action on behalf of the Tribe.  Yanity Decl. (Dkt. # 18-1), Ex. A

5   (Stillaguamish Const. Art. VII).  The court assumes that this includes the power to waive

6   sovereign immunity.  Nothing in the constitution, however, dictates how the Board must

7   take action.  The Board has the power to appoint lesser officials.  *Id.* Art. IV.  Nothing in

8   the constitution, however, explains what powers the Tribe can delegate to lesser officials.

9   It is entirely possible that the Tribe's constitution permits the Tribal Board, or perhaps

10  even the Board's Chair, to make off-the-record appointments of agents with authority to

11  waive its sovereign immunity.  *See id.* Art. XII, § 1 (permitting board to delegate

12  authority to Chair).  Federal courts have occasionally applied federal common law in

13  disputes involving tribes, but no precedent that binds this court applies federal common

14  law to the question of a tribal agent's power to waive sovereign immunity.  *See*, *e.g.*,

15  *C&L*, 532 U.S. at 423 (acknowledging that the Court had applied common-law contract

16  interpretation law to arbitration contracts in past).

17        The court concludes that state law has no bearing on who has the authority to

18  waive the Tribe's sovereign immunity.  Unfortunately, no Ninth Circuit precedent of

19  which the court is aware squarely addresses this question.  Other federal courts have

20  readily deferred to tribal law, at least where tribal law provides explicit rules regarding

21  sovereign immunity waivers.  For example, in *Memphis Biofuels, LLC v. Chickasaw*

22  *Nation Indus., Inc.*, 585 F.3d 917 (6th Cir. 2009), the court concluded that where the

23  charter of a tribal corporation required a resolution of the tribe's board before it could

24  waive sovereign immunity, the charter governed even where the party contracting with

25  the tribal corporation believed the corporation had authority to waive immunity.  *Id.* at

26  922 ("[The contractor] believed that [the tribal corporation] obtained the required

27  approval for the waiver provision – but regardless of what [it] may have thought, board

1    approval was not obtained, and [the corporation]'s charter controls."). In *Sanderlin v.*

2    *Seminole Tribe*, 243 F.3d 1282, 1288 (11th Cir. 2001), the court also applied tribal law,

3    rejecting the notion that the tribe's chief could become vested with actual or apparent

4    authority in contravention of the tribe's constitution.  Neither of these precedents binds

5    the court, but the court concludes that they are consistent with the Supreme Court's

6    admonition that "tribal immunity is a matter of federal law and is not subject to

7    diminution by the States." *Kiowa Tribe*, 523 U.S. at 756.  The court thus reaches two

8    conclusions:  state law plays no role in deciding whether a Tribe has waived its sovereign

9    immunity;[5] and where tribal law includes specific provisions governing immunity

10   waivers, federal courts respect those provisions.

11          The court assumes, without deciding, that federal common law could apply where

12   tribal law is silent or ambiguous regarding who has authority to waive sovereign

13   immunity.  The court need not decide this question because it holds that no principle of

14   federal common law supports a finding that the Tribe authorized a sovereign immunity

15   waiver in this case.

16          The explanation for the court's holding begins and ends at the October 16, 2006

17   meeting of the Tribal Board.  Pilchuck carefully explains how, in its view, the application

18   of agency principles means that Mr. Goodridge Sr. had authority to sign the Working

---

20          [5] Pilchuck notes that at least two state courts have applied state law to determine
21   questions of authority to waive tribal sovereign immunity.  In *Rush Creek Solutions, Inc. v. Ute
     Mountain Ute Tribe*, 107 P.3d 402, 407-08 (Colo. Ct. App. 2004), the court applied Colorado
22   agency principles to determine that an agent with authority to contract on behalf of the tribe had
     implicit authority to waive sovereign immunity.  The Nebraska Supreme Court similarly applied
23   Nebraska agency law principles to conclude that tribe's chairman and vice-chairman had
     apparent authority to waive the tribe's immunity.  *Storevisions, Inc. v. Omaha Tribe*, 795
24   N.W.2d 271, 279-80 (Neb. 2011) (following *Rush Creek*).  But in a recent decision, the
     Oklahoma Supreme Court concluded that "tribal law controls the way sovereign immunity can
25   be waived by the Tribe."  *Dilliner v. Seneca Cayuga Tribe*, No. 109085, 2011 Okla. LEXIS 62,
26   at *13 (Okla. Jun. 28, 2011).  For the reasons explained above, the court disagrees with the *Rush
     Creek* and *Storevisions* courts to the extent they hold that state law applies in determining who
27   has authority to waive tribal immunity.

Agreement (including its sovereign immunity waiver) on behalf of the Tribe. What it does not explain is how, when Mr. Goodridge Sr. and Mr. Nelson came to the October 2006 Board meeting to discuss the RV park project, they did not so much as mention the Working Agreement that Pilchuck had drafted two months earlier to address the project. Nor does it explain how a Working Agreement that contains many terms that no one mentioned at the October meeting, and some terms that directly contradict those mentioned at the October meeting, can be made binding on the Tribe.

At best, the October meeting is evidence that the Board agreed to a skeletal version of the agreement expressed in the Working Agreement, an agreement that included no sovereign immunity waiver. That skeletal version consisted of authorization for Pilchuck to purchase the subject property, conditioned on the Tribe's agreement to lease the land back to Pilchuck to operate the park, or to buy back the property in the event the project failed.[6] It is, of course, far from certain that the Tribe made even this limited agreement. Pilchuck makes no compelling case that Mr. Goodridge Jr.'s unilateral statement that Pilchuck would be "safe" to purchase the subject property, accompanied by the rest of the Board's utter silence, is equivalent to approval of anything. But even if Pilchuck could succeed in proving that case, it would fall well short of explaining how the Working Agreement reflects the agreement it made at the October meeting. As noted, the Working Agreement raises the buyback premium the Tribe was obligated to pay from 10 or 12 percent to 30 percent. This is no minor revision, yet the record is utterly silent as to how the Tribe authorized Mr. Goodridge Sr.

---

[6] Pilchuck reasons that even if the skeletal agreement discussed at the October meeting made no mention of sovereign immunity or arbitration, the Tribe nonetheless agreed to arbitration and an immunity waiver because it had done so in previous contracts between it and entities with which Mr. Nelson was involved. The court is aware of no authority from any jurisdiction in which a court inserted an arbitration clause or sovereign immunity clause into a contract merely because the parties had done so in previous contracts.

1   to agree to such a substantial additional burden on the Tribe.  Whatever the Tribe might

2   have agreed to at the October meeting, it was not the Working Agreement.

3          Among many other subjects that no one addressed at the October meeting was

4   whether Mr. Goodridge Sr. was to have any role in executing the Working Agreement on

5   behalf of the Tribe.  Pilchuck harps on Mr. Goodridge Jr.'s statement that it was "safe" to

6   purchase the property.  It does not suggest that even the most generous reading of the

7   transcript of the meeting would support the notion that the Board somehow authorized

8   Mr. Goodridge Sr. to finalize an agreement on the Board's behalf.  Pilchuck asks the

9   court to infer such authorization from the parties' "course of conduct."  Pilchuck

10  identifies no principle of federal common law in which course of conduct is relevant to

11  the question of who has authority to sign an agreement.  Putting that aside, however,

12  Pilchuck does not show that the Board had a "course of conduct" in which it discussed

13  agreements at its meetings and sub silentio appointed a non-member of the Board to enter

14  a more expansive agreement on behalf of the Tribe later, waiving its sovereign immunity

15  in the process.  Rather than recount the evidence Pilchuck has provided of its "course of

16  dealing" with Mr. Goodridge Sr., the court will simply observe that in the time since he

17  left the Tribal Board, there is no evidence at all that Mr. Goodridge Sr. had a practice of

18  waiving the Tribe's sovereign immunity.  There is also no evidence that the Board

19  authorized him to do so.

20         The court acknowledges Pilchuck's evidence that after the October 2006 meeting,

21  Mr. Yanity and other members of the Board took actions toward completing the RV park

22  project.  For example, it appears that Mr. Yanity approved a few environmental studies

23  necessary to the project.  If Pilchuck could succeed merely by demonstrating the

24  unfairness of the Tribe's later decision to pull out of the RV park project and assert its

25  immunity from suit in the aftermath, it might well have a chance in this suit.  Sovereign

26  immunity, however, is a doctrine whose application frequently leads to unfair results.

27  *See*, *e.g.*, *Memphis Biofuels*, 585 F.3d at 922 ("This result may seem unfair, but that is the

reality of sovereign immunity."); *Native Am. Distributing v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, (10th Cir. 2008) ("The Supreme Court has acknowledged that tribes [can] use their immunity as a sword rather than a shield . . . ."); *Kiowa*, 523 U.S. at 758 (noting "reasons to doubt the wisdom of perpetuation the [tribal sovereign immunity] doctrine," but recognizing Congress's responsibility for limiting tribal immunity). Whether this a case in which the Tribe unfairly used sovereign immunity to back out of an agreement is not a question properly before the court. The question before the court is whether the Tribe waived its sovereign immunity for disputes arising out of the RV park project. The court holds that it did not, as a matter of law.

**B.     It Is Possible That Further Discovery Will Show that STECO Entered the Working Agreement.**

Before any discovery took place in STECO's suit against Pilchuck, STECO filed a motion for summary judgment motion that it was immune from the suit. In many ways, STECO's claim to sovereign immunity mirrors the Tribe's. Tribal corporations enjoy sovereign immunity, so long as they carry out the tribe's business. *Allen*, 464 F.3d at 1046 ("When the tribe establishes an entity to conduct certain activities, the entity is immune if it functions as an arm of the tribe."). So far as the court is aware, Pilchuck does not dispute that STECO is an entity entitled to assert sovereign immunity.

Pilchuck's arbitration demand against STECO faces several hurdles beyond those it faced when attempting to bring the Tribe to arbitration. Whereas the Tribe was at least facially a party to the Working Agreement containing a sovereign immunity waiver, STECO is nowhere mentioned in the Working Agreement. Pilchuck urges the court to overlook this detail. It contends that a court could conclude that the Working Agreement's references to the Tribe "did not just mean the Tribe itself but also its relevant bodies and organizations, including STECO." Def.'s Mot. at 11. Mr. Goodridge Sr. declares that he had authority by virtue of his position as STECO's Chair to enter contracts without the express approval of the STECO board. Goodridge Sr. Decl. ¶ 8.

1   Nonetheless, he asserts that STECO's board did approve the Working Agreement, even

2   though it did not approve it in writing. *Id.* ¶¶ 19, 21.

3       STECO contends that its charter requires its board to approve all waivers of

4   sovereign immunity in writing. STECO is, like the Tribe, flatly mistaken. Its charter

5   explains that the STECO board has the power to waive STECO's immunity, although it

6   cannot waive the Tribe's immunity. Charter ¶ 3.3(l). The charter does not, however,

7   provide any procedures for waiving immunity. Moreover, despite STECO's insistence to

8   the contrary, nothing in the charter requires the board to take action via written

9   resolution. The board's directors must "in all cases act as a board," but nothing requires

10   their actions to be memorialized in writing. ¶ 5.7. The charter empowers the STECO

11   Chair to sign any document that its board approves, but again does not require approval

12   in writing. Charter ¶ 5.21(a). Moreover, the charter empowers any officer or director to

13   enter contracts on behalf of STECO, and notes that the authorization can be for a specific

14   contract or a more general authorization. Charter ¶ 8.5. Again, there is no requirement

15   that the authorization be in writing. As was the case with the Tribe, Pilchuck presents

16   evidence that STECO's practices regarding contract authorization were haphazard.

17   Sometimes the STECO board authorized particular contracts in writing, sometimes it did

18   not.

19       Pilchuck insists that further discovery will help it prove that STECO is a party to

20   the Working Agreement and thus waived its sovereign immunity. The court cannot rule

21   out this possibility. It is possible that discovery will reveal that STECO had a practice of

22   binding itself to contracts to which only the Tribe was explicitly a party. It is possible

23   that discovery will show that STECO and Pilchuck understood STECO to be a party to

24   the Working Agreement. It is possible that discovery could show that Mr. Goodridge Sr.

25   had the approval of the STECO board to enter the Working Agreement on behalf of

26   STECO. Regardless of the likelihood of Pilchuck prevailing in this quest, the mere

27

1   possibility means that the court cannot grant summary judgment without permitting

2   additional discovery.  *See* Fed. R. Civ. P. 56(d).

3          The court warns Pilchuck, however, that if it puts STECO through the expense of

4   discovery to employ the same strategy that it did in opposing the Tribe's assertion of

5   immunity, the court will consider imposing sanctions.  If Pilchuck's additional discovery

6   shows merely that members of the STECO board approved the RV park project, then

7   Pilchuck will fare no better in its dispute with STECO than in its dispute with the Tribe.

8   Pilchuck's task is, at a minimum, to show that STECO's board authorized Mr. Goodridge

9   Sr. to bind STECO to the Working Agreement and its sovereign immunity waiver.  If it

10  cannot do so, then additional discovery to show that STECO, like the Tribe, once

11  supported the RV park project is of no value.

12         The court accordingly orders as follows.  No later than September 23, 2011,

13  Pilchuck must choose one of the following options.  It can file a statement that that

14  court's holding in the Tribe case against Pilchuck is dispositive of STECO's case against

15  Pilchuck, and permit the court to enter a judgment consisting of a permanent injunction

16  against further efforts to pursue arbitration against STECO.  Alternatively, it can file a

17  statement indicating that it has a good faith basis to believe that further discovery will

18  yield evidence that the STECO board authorized Mr. Goodridge Sr. to bind it to the

19  Working Agreement, including its sovereign immunity waiver.  In that event, the parties

20  may begin discovery.

21                                    **IV. CONCLUSION**

22         For the reasons stated above, the court GRANTS the Tribe's motion for summary

23  judgment (Dkt. # 18) and DENIES Pilchuck's motion (Dkt. # 21).  The court also

24  DENIES Pilchuck's motion to seal.  Dkt. # 19.  The court permanently enjoins Pilchuck

25  from commencing or continuing arbitration against the Tribe regarding any dispute

26  arising out of the Working Agreement or any agreement regarding the RV park project

27

1   that the Tribe made with Pilchuck at its October 2006 Board meeting.  The court directs

2   the clerk to enter judgment for the Tribe.

3        The court will enter a separate order memorializing its decision in STECO's suit

4   against Pilchuck, No. 11-387RAJ.

5        DATED this 7th day of September, 2011.

6

7

8                                          _____

9                                          The Honorable Richard A. Jones

10                                         United States District Court Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ORDER- 17